**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

LANCE MARTIN and CONNIE           §
MARTIN, individually and as next friend    §
to DENISE LYNN MARTIN,            §
                                  §
          Plaintiffs,              §
                                  §
v.                                §     CIVIL ACTION NO. H-04-4160
                                  §
TEXAS DEPARTMENT OF               §
PROTECTIVE AND REGULATORY         §
SERVICES, *et al.,*               §
                                  §
          Defendants.              §

## MEMORANDUM AND ORDER

Lance and Connie Martin sued the Texas Department of Protective and Regulatory Services (TDPRS), the Fort Bend Independent School District (FBISD), and a number of TDPRS and FBISD employees. The Martins alleged that the one-month removal of their daughter, Denise, from their home based on a teacher's report of suspected sexual abuse violated federal and state constitutional rights, as well as state statutory and common law. TDPRS and the individually named TDPRS employees, Thomas Chapmond, Karen Sheehan, Sherrece Haywood, Amy Odin, and Janie Hughes have moved to dismiss the Martins' claims against them on the basis of sovereign immunity. (Docket Entry No. 4, 7, 8, and 9.) The FBISD and individual defendants Betty Baitland, Christine Saberi, and Ericka Delagarza have moved for summary judgment on the basis of qualified immunity.

Based on the pleadings, the motions, the parties' submissions, and the applicable law, this court grants the TDPRS motion to dismiss; grants in part and denies in part the TDPRS employees' motions to dismiss; grants FBISD's and Betty Baitland's motions for summary judgment; and grants Ericka Delagarza's motion for summary judgment. On the present record, this court is unable to decide whether to grant Christine Saberi's motion for summary judgment. The record discloses disputed fact issues but does not contain sufficient information to allow this court to decide whether those disputes are material to determining the legal question of qualified immunity. Additional discovery and a supplemented record are necessary to resolve the legal question whether this defendant is entitled to qualified immunity.[1] Because the TDPRS individual defendants have not moved for summary judgment on the basis of immunity, it is appropriate to set a schedule that will coordinate any discovery tailored to qualified immunity and the presentation of motions and the filing of briefs and a supplemented record. The parties are to appear for a scheduling conference on

---

[1]     *See Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir.2004) (en banc) ("[I]n an interlocutory appeal we cannot challenge the district court's assessments regarding the sufficiency of the evidence--that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true."). The court of appeals does, however, have jurisdiction to decide whether the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on a given set of facts. *Id*. Interlocutory appellate jurisdiction is proper only to the extent that the appeal concerns the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record. *Id.; see also Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir.2001)(stating that in determining a question of law "the materiality of the factual disputes may be reviewed, but not their genuineness").

**September 9, 2005**, at 9:00 a.m. to determine the discovery appropriate to resolve qualified immunity issues and to set a motion and briefing schedule.

The reasons for these decisions are set forth below.

## I.      Factual and Procedural Background

Plaintiffs' Original Complaint sets out a detailed account of the events and communications at issue.  (Docket Entry No. 1.)  Lance and Connie Martin are the parents of nine-year-old Denise, an autistic, mentally retarded girl.  Denise is nonverbal but outgoing and affectionate toward others.  She is not toilet trained, given to frequent tantrums, has difficulties controlling her temper and emotions, and requires medication to help control some aggressive behaviors, such as scratching others.  On August 15, 2002, Denise began attending a class for special needs students in the FBISD.  Christine Saberi taught the class, assisted by three FBISD employees, including teacher's aide Ericka Delagarza.  Saberi communicated with the students' parents, including the Martins, through a "communications book,"  in which she would write daily comments about each student's behavior in school to the respective parents.  Denise brought her book back and forth between home and school.  The Martins would sign the book indicating that they had read the daily report, respond to any questions that Saberi had posed, provide additional information about Denise's expected behaviors, medications, and likely reactions to certain stimuli, and provide a report of relevant events at home, ranging from bowel movements to sleeping patterns.  Saberi exchanged the book with the Martins for approximately one month without incident. Portions of the book are included in the summary judgment record.

Shortly after the school year began, Saberi noted in one entry in the communications book that Denise had been lifting up her shirt occasionally.  Martin responded that this Denise had engaged in similar behavior at her old school, and explained it as a form of testing limits.  Saberi and the Martins continued to exchange notes about Denise's behavior at school and the best ways to respond.  On September 19, Saberi stated that she would like to meet with the Martins to "talk about some of Denise's behaviors."  No explanation was provided.  Because the Martins worked, they asked if an "Admissions, Review, and Dismissal" ("ARD") meeting could be scheduled in two or three weeks.   In the meantime, the communications book went back and forth between school and home.  Saberi noted events such as tantrums and agitation, and Connie Martin provided explanations as appropriate.

On October 2, Saberi sent a note home in the communication book stating that Denise had had a "couple of tantrums" and scratched some of the teachers, and did not seem to like some food she was given.  Saberi noted that Denise had a small bruise above her left breast and one on the left calf and a small scratch.  Saberi took Denise to the nurse "to be sure she was o.k."  On the same date, the Child Protective Services (CPS) branch of TDPRS was notified of a potential sexual abuse case involving the Martins.  On October 3, 2002, CPS referred the Martins' case to the Fort Bend County Sheriff's Office as one of neglectful supervision.  Detective William Dowdy, III was assigned to investigate. (Docket Entry No. 1, Ex. U.)

4

On October 10, 2002, Connie Martin met with Saberi, as well as an FBISD psychiatrist and FBISD social worker, for the ARD meeting.  The accounts of the meeting are conflicting.  Saberi stated in her affidavit that during the meeting, she "expressed . . . concern regarding [Denise's] behavior with her mother, but her mother could not provide adequate explanations for the inappropriate behavior."  (Docket Entry No. 22, Ex. A, ¶ 5.)

In the Complaint and Affidavit, Connie Martin asserts that the topics discussed were "Denise's 'taking her clothes off in class'" and "problems with Denise at home."  (Docket Entry No. 25, Tab B, ¶ 15.)  Connie Martin stated that she explained to the FBISD employees that Denise was simply being defiant when she lifted her shirt and had exhibited the same behavior at her previous school.  Martin explained that she "never saw many of the behaviors she [Saberi] complained of exhibited at school . . . repeated at home."  (*Id.*)

After returning home from the ARD meeting, Connie Martin discovered a message on the telephone answering machine from defendant Sherrece Haywood, a CPS caseworker and investigator.  Haywood asked to meet with the Martins to discuss a child abuse report.  Mrs. Martin called Haywood back and set up an appointment for the following day.  The summary judgment record contains conflicting information as to when the report was made to CPS.  The CPS records show that they received the report on October 2.  In Saberi's affidavit, she stated that she reported her suspicion of sexual abuse to CPS on October 10, 2003, after the ARD meeting, because "her mother could not provide adequate explanations for the inappropriate behavior."  There is no explanation for the discrepancy.

On October 11, 2002, Haywood came to the Martins' home and questioned them about a variety of behaviors and issues that Saberi had noted at school, including Denise taking her clothes off, a bruise that Saberi had noted above Denise's left breast, and Denise "french kissing" people at school.  (Docket Entry No. 1, ¶ 41.)  The Martins reiterated to Haywood that Denise took her clothes off at school as an act of defiance and explained that licking things is one of Denise's autistic behaviors.  The Martins told Haywood that Denise began licking Mrs. Martin's lips when Mrs. Martin kissed her while wearing lipstick because Denise liked the lipstick flavor.  *(Id.)*  The Martins allege that Haywood was  satisfied that the mark above Denise's left breast was a bruise and not a "hickey."  *(Id.)*  At the conclusion of the meeting, Haywood told the Martins that she saw no problems with Denise's behavior and would take care of the case.  On October 16, 2002, Haywood contacted Detective Dowdy to report that she had interviewed the Martins and that they "appeared to be protective of providing for [Denise] in a satisfactory manner."  (Docket Entry No. 1, Ex. U.)

At some point between October 9, 2002, the day before the ARD meeting, and October 14, 2002, Saberi stopped sending the communications book home with Denise. When Mrs. Martin asked for the book, Saberi sent it home without any written pages.  Mrs. Martin then requested the pages that had been removed from the book.  Saberi returned the pages, but these now included at least one new page with additional notations for the previously written daily entries.  For example, the original August 21, 2002 entry related the events of the school day noted that Denise lifted up her shirt occasionally, and suggested that Denise should try wearing a training bra.  (Docket Entry No. 1, Ex. A.)  An additional

comment on the new page now supplemented the original August 21 entry by noting that Denise "continues to exhibit the same inappropriate behaviors; touching herself and attempting to touch others in appropriately." (Docket Entry No. 1, Ex. O.)  According to Connie Martin, that entry was added after the fact of the CPS report.  Similarly, the original September 13, 2002 entry stated that Denise had a good day at school and included comments about the sandals that the Martins had sent to school with Denise.  (Docket Entry No. 1, Ex. F.)  A supplemental comment on the new page of notes stated that "Denise grabbed [teaching assistant] Ericka by the neck and she pulled Ericka towards her and stuck out her tongue to kiss Ericka."  (Docket Entry No. 1, Ex. O.)  Again, this entry was, according to Mrs. Martin, added after the date and after the fact of the CPS report.

After Saberi returned the communications book, the Martins began exchanging it with her again.  Denise's condition requires her to wear diapers, which school personnel change as needed during the school day.  In the October 15, 2002 communications book entry, Saberi noted that Denise was "red and raw around her private area."  Saberi took Denise to the school nurse, who gave the teachers an antibacterial ointment to use.  (Docket Entry No. 1, Ex. K.)  After reading this, the Martins called Haywood immediately and asked her to come and examine Denise.  Haywood came that same day, examined Denise, and, according to the Martins, found no redness or rawness.

The following week, Haywood called the Martins and informed them that someone at FBISD had accused Lance Martin of sexually assaulting Denise.  Connie Martin offered to take Denise to the family doctor for an examination, but Haywood asked that Denise be

taken to the Children's Assessment Center (CAC) instead.  On October 18, 2002, Mrs.

Martin took Denise to the CAC, where nurse Ellen Taft examined her.[2]  With Mrs. Martin

present in the room, Taft called Haywood to report that she suspected some kind of

penetrating trauma.  Nevertheless, Taft said she was comfortable with allowing Denise to

return home.

Haywood visited the Martins later that same day and threatened to remove Denise

from the home as a result of the medical findings.  (Docket Entry No. 1, ¶ 45.)  Ultimately,

the Martins and Haywood decided together that Mrs. Martin's mother should come to live

with them during the CPS investigation.  Mrs. Martin's mother moved in that afternoon.  *(Id.)*

Later that day, Haywood returned to the Martins' home with a safety plan, which the Martins

signed and followed.  (Docket Entry No. 1, ¶ 46.)  The Martins did not hear from CPS for

the next ten days.  (Docket Entry No. 1, ¶ 47.)

On October 29, 2002, Haywood contacted Detective Dowdy and said that Denise's

teachers had collected some "suspicious" hairs from the vaginal area and diaper since the

original report had been made to CPS.  Dowdy talked to Delagarza, the teacher's aide for

Saberi's class, who explained that she was the one who had located and collected the hairs.

In her affidavit, Delagarza stated that "in early October," she had found hairs "on multiple

occasions"  on the wipes used to clean Denise after she used the restroom.  No report was

---

[2]        Nurse Taft is mistakenly identified as a doctor in the affidavit from Haywood that
accompanies the TDPRS October 30, 2002 petition to terminate the Martins' parental rights.
(Docket Entry No. 1, ¶ 58.)

made to the parents.  Again, there is a discrepancy between the date the teacher identified in her affidavit and the date shown on the official investigative records.

On October 29, 2002, Haywood and defendant Amy Odin, another CPS employee, came to the Martin home, entered without permission, and told Lance Martin that they were taking Denise away immediately, treating the situation as an emergency.  (Docket Entry No. 1, ¶ 48.)  Although Haywood later told Detective Dowdy that she was instituting removal proceedings based on Taft's report, on that date, Haywood explained to the Martins that CPS had received new medical information.  (Docket Entry No. 1, ¶ 49.)  The Martins protested, but allowed Haywood and Odin to take Denise away after Odin told them that they should feel "lucky" that CPS was not taking their other child as well.  (Docket Entry No. 1, ¶ 50.)  The Martins interpreted this comment as a warning to consent to Denise's removal or risk losing custody of both their children.  (*Id.*)  Denise was placed in foster care.

On October 30, 2002, CPS filed an Original Petition for Protection of a Child, Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship (SAPCR) against the Martins, with a request for emergency relief.  The petition stated that "the child has been the victim of sexual abuse on one or more occasions and there is a substantial risk that the child will be the victim of sexual abuse in the future."  (Docket Entry No. 1, Ex. Q, 3.)  Haywood submitted a supporting affidavit, which included statements the Martins dispute.  The affidavit stated: "Denise's behavior had deteriorated rapidly, and it has mostly been in a sexual nature.  Today Denise went to school with a bruise on the left breast that looks like a hickey."  The Martins assert that Haywood had seen the bruise and

concluded it was just that – a bruise.  The affidavit stated:  "Denise has been grabbing school staff by the neck and trying to French kiss them.  Denise has been lifting staff skirts up, and grabbing under their blouses.  Denise began to play with her private parts, in the cafeteria. . . . Some of this has already been mentioned to the parents, who have no answers."  The Martins deny that they had been told anything about "French kissing," lifting staff members' skirts, or that Denise was inappropriately touching herself, and point out that they provided explanations for the behavior they were told about.  Haywood stated in the affidavit that "Denise's autism, classically, would have her withdrawn, not literally reaching out and grabbing others."  The Martins point out that Haywood and Saberi knew that Denise does not suffer from a classic form of autism, but instead interacts freely with others.  The Martins deny that they made any statement that Denise was afraid to lie down on her bed, a statement that appears in different reports.  The Martins allege that Haywood included these statements in the affidavit despite knowledge that they were false.

Haywood's affidavit also noted that Ericka Delagarza, the teaching assistant in Saberi's special needs class, had found several hairs inside Denise's diaper after the initial CPS report was made.  On October 30, 2002, Dowdy picked up from Delagarza five plastic, zip-lock bags containing dark-colored hairs of different lengths and booked the bags into the Fort Bend County Sheriff's Office Evidence Room.  No investigation of the hairs was made.

Eventually, the Martins were allowed to visit Denise at the CPS office.  They discovered that Denise had a number of new bruises different from the kind of bruises they had previously seen Denise inflict on herself.  The Martins expressed concerns about these

bruises to CPS employees, but claim that CPS never investigated.  On November 18, 2002, CPS returned Denise to the Martins' care after Lance Martin passed a private polygraph test. Two days later, on November 20, 2002, CPS filed a Notice of Nonsuit in the Martins' case. On November 21, 2002, Detective Dowdy closed the Martins' criminal investigation because "there is not enough evidence to prove that a criminal offense has been committed." (Docket Entry No. 1, Ex. U.)

On November 27, 2002, the Martins asked the Fort Bend County Sheriff's Office to investigate the bruises Denise had acquired while in CPS custody.  On December 2, 2002, Detective Dowdy obtained the contact information for Denise's foster home and for Sue Akins, the CPS employee responsible for placing Denise in foster care.  Dowdy interviewed Akins on December 10, 2002 and determined that Denise had inflicted the bruises on herself after her foster caregiver had run out of the medication that Denise took to control her behavior.  Dowdy's report indicates that Denise's caregiver had requested the necessary medication once her original supply had run out five days before Denise was returned to her parents.  Although the caregiver had requested additional medication, she was unable to obtain any from CPS.  (Docket Entry No. 1, Ex. T.)  Dowdy closed the investigation on January 3, 2003.  The Martins filed this suit in October 2004, seeking damages, declaratory relief, and an injunction removing their names from any lists of suspected child abusers.

The TDPRS and its employees have moved to dismiss the Martins' claims against them for lack of jurisdiction and for failure to state a claim upon which relief can be granted. The TDPRS defendants assert sovereign immunity.  (Docket Entry No. 4, 7, 8, 9.)  The

FBISD and its employees have moved for summary judgment on the Martins' claims against them.  FBISD asserts that there is no constitutional violation and that the Martins cannot establish the elements necessary for municipal liability under 42 U.S.C. § 1983.  The FBISD employees assert the affirmative defense of qualified immunity.  (Docket Entry No. 22.)

Each motion, and response, is examined below.

## II.    The Motions to Dismiss

### A.    The Rule 12(b) Standard

Under Rule 12(b)(1), a plaintiff's claim must be dismissed when the court lacks jurisdiction over the subject matter of that claim. Rule 12(b)(1) requires the dismissal of a case for want of subject matter jurisdiction when the district court lacks the statutory and constitutional power to adjudicate the case.  A district court may dismiss a case for want of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera-Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996). The burden for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *Ramming v. U.S.,* 281 F.3d 158, 161 (5th Cir. 2001).  However, a court must take the facts as true and resolve inferences and doubts in the plaintiff's favor. *In re Supreme Beef Processors, Inc.,* 391 F.3d 629, 633 (5th Cir. 2004).  When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing the attack on the merits. *Id.*

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) dismissal is appropriate if there is no set of facts that could be proven consistent with the complaint's allegations that would entitle the plaintiff to relief.  *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).  The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff.  *Id.*  In order to avoid dismissal, however, a court need not "accept as true conclusory allegations or unwarranted deductions of fact."  *Id.* (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2001).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with one important exception.  In *Collins*, 224 F.3d at 498–99, the Fifth Circuit approved the district court's consideration of documents the defendant attached to a motion to dismiss.  In *Collins* and later in *Scanlan*, the Fifth Circuit made it clear that "such consideration is limited to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim."  *Scanlan*, 343 F.3d at 536 (citing *Collins*, 224 F.3d at 498–99).  Other courts approve the same practice, stating that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."  *Venture Assocs. Corp v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993); *see also Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1998); *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994).

**B.       Sovereign Immunity**

"The eleventh amendment clearly interposes a jurisdictional bar to suits against a state by private parties who seek monetary relief from the state in the form of compensatory damages, punitive damages, or monetary awards in the nature of equitable restitution, and also to suits against a state or state agency or state official when the monied award is to be paid from the state treasury." *Chacko v. Texas A & M University*, 960 F. Supp. 1180, 1197 (S.D. Tex. 1997) (quoting *Clay v. Texas Women's Univ.*, 728 F.2d 714, 715 (5th Cir. 1984)), *aff'd*, 149 F.3d 1175 (5th Cir. 1998); *see also Edelman v. Jordan*, 415 U.S. 651, 663 (1974). This immunity extends to federal claims against state employees in their official capacities. Such claims are equivalent to suits against the State and are subject to the Eleventh Amendment bar. *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 690 n.55 (1978); *Ganther v. Ingle*, 75 F.3d 207, 209 (5th Cir. 1996).

Consistent with the principle of sovereign immunity, the Supreme Court has held that neither a State nor its officials acting in their official capacities are "persons" who can be sued under 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). There is an exception to the Eleventh Amendment prohibition on suits against a state for suits seeking to enjoin acts by state officials that are contrary to federal law. *Ex parte Young*, 209 U.S. 123 (1908); *Morris v. Dearborne*, 69 F. Supp. 2d 868, 881 (E.D. Tex. 1999). To bring a suit under the *Ex parte Young* exception, the plaintiff must bring the suit against individual persons in their official capacities as agents of the State and seek prospective declaratory or injunctive relief. *See Cox v. City of Dallas*, 256 F.3d 281, 307–309 (5th Cir. 2001). The Supreme Court has acknowledged that in suits such as these, a state official is a "person"

under section 1983 because "official-capacity actions for prospective relief are not treated as actions against the state." *Kentucky v. Graham,* 473 U.S. 159, 167 n.14 (1985).

### C.    The TDPRS Motion to Dismiss

The TDPRS moves to dismiss the Martins' complaint for lack of jurisdiction based on sovereign immunity and failure to state a claim under section 1983 based on the fact that it is not a "person" subject to suit under section 1983. (Docket Entry No. 4.) The Martins have not responded to the TDPRS motion to dismiss.

The TDPRS has not waived its sovereign immunity. The motion to dismiss is granted.

### B.    The TDPRS Employees' Motion to Dismiss

Thomas Chapmond, Karen Sheehan, Sherrece Haywood, Amy Odin, and Janie Hughes, all present or former employees of TDPRS, invoke sovereign immunity and move to dismiss the Martins' claims against them for lack of jurisdiction, as well as for failure to state a claim.  (Docket Entry No. 7, 8, and 9.)

The Supreme Court has construed *Ex parte Young* to permit section 1983 suits for prospective injunctive relief against individuals in their official capacities. *Graham,* 473 U.S. at 167 n.14.  In their Original Complaint, the Martins specify that they are suing the individual defendants in both their official and individual capacities. (Docket Entry No. 1.) In their responses to these defendants' motions to dismiss, the Martins further clarify that they seek damages against the individual defendants in their individual capacities and only prospective relief against the individual defendants in their official capacities. (Docket Entry No. 14, 15, 16.)  Under *Graham*, defendants cannot assert sovereign immunity as a defense

to suits against them in their individual capacities, or to suits for prospective injunctive relief against them in their official capacities. *Graham*, 473 U.S. at 165–167.[3]

This court grants the TDPRS employee defendants' motions to dismiss as to claims for damages that the Martins assert against them in their official capacities. This court denies the TDPRS employee defendants' motions to dismiss with regard to claims for damages that the Martins assert against them in their individual capacities, and claims for prospective injunctive relief that the Martins assert against them in their official capacities.

## III.    The Motions for Summary Judgment

### A.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). If the burden of proof at trial lies with the nonmoving party, the movant may either (1)

---

[3]    The Martins seek a declaration that "the Defendants' actions were wrongful." (Docket Entry No. 1, ¶ 69.) The Supreme Court has held that plaintiffs are not entitled to a declaratory judgment that defendants violated federal law in the past because such a judgment "might be offered as res judicata on the issue of liability" and would serve as a "partial 'end run' around" Eleventh Amendment sovereign immunity. *Green v. Mansour*, 474 US 64, 72–73 (1985). *See also Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1287 (5th Cir. 1992) ("It is appropriate that we recognize that reality [that a non-prospective declaratory judgment is an '"end run" around a defendant's immunity'] in determining whether declaratory relief is warranted.").

submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Calbillo v.*

*Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

### B.     The Qualified Immunity Standard

"Qualified immunity protects officials in the course of performance of their discretionary duties unless their conduct violates a 'clearly established [federal] statutory or constitutional right[ ] of which a reasonable person would have known."  *Gutierrez v. City of San Antonio*, 139 F.3d 441, 445 (5th Cir. 1998) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (alterations in original); *see also Anderson v. Creighton*, 483 U.S. 635, 637 (1987); *Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir. 1997); *Warnock v. Pecos County*, 116 F.3d 776, 781 (5th Cir. 1997).  To determine if qualified immunity applies, the district court must follow a two-step process.  First, the court must determine whether the plaintiff has asserted a violation of a clearly established constitutional or statutory right.  *See Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998); *Gutierrez*, 139 F.3d at 445 (*citing Siegert v. Gilley*, 500 U.S. 226, 231 (1991)); *Colston*, 130 F.3d at 99 (*citing Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994)); *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996).  If an official has violated a person's federal civil rights, the second analytical step is to determine whether the official's actions were objectively reasonable.  *See Gutierrez*, 139 F.3d at 445; *Morin*, 77 F.3d at 120; *see also Anderson*, 483 U.S. at 639.

The issue in the second analytical step is "whether a reasonable person would have believed that his [or her] conduct conformed to the constitutional standard in light of the information available . . . and the clearly established law." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). The objective reasonableness of the official's conduct is measured with reference to the law as it existed at the time of the conduct in question. *See Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994). "The subjective intent of the public official is irrelevant, and the official's knowledge of the relevant law need not rise to the level of a 'constitutional scholar.'" *Swyden*, 139 F.3d at 466 (*quoting Harlow*, 457 U.S. at 815–17). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *See Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994) (*citing Anderson*, 483 U.S. at 639). "The qualified immunity defense 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (*quoting Hunter v. Bryant*, 502 U.S. 224, 226 (1991)).

### C.    The FBISD Motion for Summary Judgment

FBISD moves for summary judgment and asserts two primary arguments: (1) that the Martins cannot establish a constitutional violation under section 1983, either by FBISD or its employees; and (2) that the Martins cannot establish the necessary elements for municipal liability under section 1983. This court grants FBISD's motion for summary judgment because the undisputed facts in the record show that, as a matter of law, the Martins cannot establish the necessary elements for municipal liability.

"A municipality may be held liable under section 1983 for a deprivation of rights protected by the Constitution or federal law only if that deprivation is inflicted pursuant to an official, municipal policy." *Campbell*, 43 F.3d at 977; *see also Esteves*, 106 F.3d at 677. Municipal liability cannot be sustained under a theory of *respondeat superior. Id.* (*citing Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997)).  Rather, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Id.* (*quoting Piotroski*, 237 F.3d at 578).  A plaintiff must identify a policymaker with final policymaking authority and the policy or custom that is the "moving force" behind the alleged constitutional violation.  *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (*citing Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

The Fifth Circuit defines official policy or custom as follows:

> 1.      A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmakers or by an official to whom the municipality has delegated policy-making authority; or

> 2.      A persistent, widespread practice of municipal officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992); *see also Eugene*, 65 F.3d at 1304. The policy or custom must be "the moving force of the constitutional violation." *Monell*, 436 U.S. at 694.

The summary judgment evidence in the record includes FBISD's policy requiring any employee with cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect to make an immediate report to an appropriate law enforcement authority. (Docket Entry No. 22, Ex. C-1.) This district policy codifies Texas Family Code § 261.101, which also requires teachers to report suspicions of child abuse or neglect. (Docket Entry No. 22); TEX. FAM. CODE ANN. § 261.101 (Vernon 2002). FBISD argues that the policy, by requiring what Texas law also mandates, cannot be the moving force behind a violation of the Martins' constitutional rights. (Docket Entry No. 22.)

In response, the Martins have argued that Saberi ignored FBISD policy when making her initial report to CPS and convening an ARD meeting with Mrs. Martin, a school psychiatrist, and a school social worker. Indeed, they assert that Saberi and Delagarza "openly disregard[ed] state law and printed FBISD policy" when they organized the ARD meeting to discuss Denise's behavior in class. (Docket Entry No. 25, ¶ 64.) However, the Martins do not explain or present summary judgment evidence as to how Saberi and Delagarza's disregard for district policy could lead to the district's liability for the individual defendants' conduct. The Martins simply assert that "such open and blatant violation of printed policy is evidence of . . . actual or constructive knowledge of the custom or policy that led to Plaintiffs' injury." (Docket Entry No. 25, ¶ 65.) Nothing in the record indicates

that FBISD had a custom or policy of encouraging or permitting its employees to make false reports of child abuse or neglect or convening inquisitorial ARD meetings.   The Martins have failed to raise a genuine issue of material fact as to whether Saberi's and Delagarza's allegedly unconstitutional conduct was an isolated incident, or instead was "directly attributable to the municipality through some sort of official action or imprimatur." *Rivera*, 349 F.3d at 247 (citing *Piotrowski*, 237 F.3d at 578).

The Martins also allege improper training.  "[I]t is . . . difficult . . . even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice–that is, proof that the policymakers deliberately chose a training program which would prove inadequate." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion).   A municipality acts with deliberate indifference when "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390.  "'A showing of simple or even heightened negligence will not suffice.'" *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997).  The plaintiff must also show that the inadequate training procedures directly caused the plaintiff's injury. *See Holland*, 1999 WL 14661, at *22 (citing *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996)).

"For governmental liability to attach, the lack of proper training, rather than 'factors peculiar to the officer involved in a particular incident,' must be 'the moving force behind the plaintiff's injury.'" *Id.* at *23 (quoting *Brown*, 520 U.S. at 408). "Generally, there must be considerably more proof than a single instance of injury or an isolated case of a poorly trained employee before municipal liability attaches in a case in which the plaintiff alleges a policy of failure to train employees adequately." *Id.* "The plaintiff must demonstrate 'at least a pattern of similar incidents in which the citizens were injured . . . to establish the official policy requisite to municipal liability under section 1983.'" *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (quoting *Rodriguez v. Avita*, 871 F.2d 552, 554-55 (5th Cir. 1989)) (alteration in original), *cert. granted in part*, 119 S. Ct. 863, *and cert. dismissed*, 1999 WL 228404 (U.S. Apr. 20, 1999) (No. 98-509).

Plaintiffs' conclusory allegations that the FBISD failed properly to train its teachers in recognizing and reporting sexual abuse of children – admittedly difficult when the child is not able to speak – does not survive FBISD's motion for summary judgment. FBISD's motion for summary judgment is granted.

### D.   Betty Baitland

Betty Baitland, the FBISD superintendent, moves for summary judgment on the basis of qualified immunity. The Martins have not pointed to any specific conduct attributable to Baitland that they assert violated their constitutional rights. The Martins do assert that Baitland failed to instruct, supervise, control, and discipline Saberi and Delagarza in their duties. (Docket Entry No. 1, ¶ 113.) Baitland cannot be held liable under section 1983 on

the basis of *respondeat superior*. *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997). "Rather, the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor." *Id.* (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc)). The summary judgment record does not show that any failure to train or supervise contributed to cause the alleged violation of the Martins' constitutional rights. *See Rivera*, 349 F.3d at 247 (citing *Piotrowski*, 237 F.3d at 578). Baitland's motion for summary judgment is granted.

### E.      Christine Saberi and Ericka Delagarza

Christine Saberi, the teacher of Denise's special needs class who reported to CPS that she suspected Denise was a victim of sexual abuse, and Ericka Delagarza, a teaching assistant in the class who also spoke to investigators about the report, also move for summary judgment based on qualified immunity. The Martins alleged a number of causes of action, including substantive due process violations of the right to family integrity. The threshold issue is whether the Martins have stated a claim for a violation of a constitutional right. Saberi and Delagarza argue that a report of abuse or neglect, made in compliance with FBISD policy and state law, cannot amount to a violation of a constitutional right.

The Fifth Circuit has acknowledged that "many aspects of family integrity possess constitutional stature." *Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir. 1988). In a recent case, the court clarified that there is a constitutional right to family integrity, although its contours may remain unclear in certain cases. In *Morris v. Dearborne*, 181 F.3d 657 (5th Cir. 1999), the court made clear that a complaint alleging that a teacher made a false report

that a parent sexually abused a child alleged a violation of this substantive due process right. Id. at 667.  The court also held that a complaint alleging that a teacher fabricates evidence of child abuse alleges conduct that is so outrageous as to shock the conscience. *Id*. at 668. The Martins have alleged the denial of a constitutional right because they have alleged that Saberi made a false report to CPS.

The second analytical step is to determine whether the teachers' actions were objectively reasonable.  *See Gutierrez*, 139 F.3d at 445; *Morin*, 77 F.3d at 120; *see also Anderson*, 483 U.S. at 639.  The issue in the second analytical step is "whether a reasonable person would have believed that his [or her] conduct conformed to the constitutional standard in light of the information available . . . and the clearly established law." *Goodson v. City of Corpus Christi*, 202 F.3d at 736.  The Fifth Circuit has recognized that the formulation of the right to family integrity can be vague and overly generalized, and as a result, "reasonable government officials, knowing only that they must not infringe on family integrity, would not necessarily know just what conduct was prohibited." *Kiser v. Garrett*, 67 F.3d 1166, 1172 (5th Cir. 1995) (quoting *Hodorowski*, 844 F.2d at 1217).  Similarly, the Fifth Circuit noted in *Doe v. State of Louisiana* that the right to family integrity has a "nebulous nature."  2 F.3d 1412, 1417 (5th Cir. 1993).  In *Kiser*, the court stated that the contours of a substantive due process right to family integrity "are not well-defined, and continue to be nebulous, especially in the context of a state's taking temporary custody of a child during an investigation of possible parental abuse." 67 F.3d at 1173.  Accordingly, the Fifth Circuit has affirmed district court decisions recognizing qualified immunity for state

actors whose reports or investigations of  complaints of child abuse actions result in the temporary removal of a child from her parents' custody.  In these cases, the Fifth Circuit recognized that  social workers investigating suspected child abuse are entitled to qualified immunity, even in the face of evidence that the social workers unnecessarily prolonged an investigation, threatened parents with removal of their children, and even misled families about the danger facing their children.[4]

In *Morris*, the Fifth Circuit found that a teacher was not entitled to qualified immunity because she had made a child abuse report based on manufactured evidence.  Using a word-processing device known as a "Facilitative Communicator," the teacher guided the hands of a four-year-old child suffering from elective mutism to type out sexually explicit and graphically violent allegations of sexual abuse at the hands of her parents.  The teacher had

---

[4]        In *Hodorowski*, for example, the court found that employees of the Texas Department of Human Services (TDHS) acted reasonably when they decided to remove two seven year-old girls from their home after receiving a call that the girls' father had been chasing them with a chain through their front yard. When they investigated, the TDHS employees discovered that the girls had extensive bruises.  The children remained in TDHS custody without a court order for several days until a court held a hearing.  Under these circumstances, the Fifth Circuit found that the TDHS employees' actions were objectively reasonable and that the employees were entitled to qualified immunity.  Accordingly, the court found that a social services caseworker investigating a report of child sexual abuse was entitled to qualified immunity, despite strong evidence of bad faith on the part of the caseworker.  844 F.2d at 1217.  The caseworker had misled or falsely informed the parents and authorities about the alleged danger the children were in; concealed evidence that would have exonerated the children's father; instituted an unjustified investigation of abuse by the children's temporary caretakers, their grandparents; and threatened the children's mother that the children would be placed in a foster home in another city if she did not provide evidence that the children's father had sexually abused them.  *Id*.  Although the caseworker's actions caused the sexual abuse investigation to drag on unnecessarily for four months, the Fifth Circuit found that the caseworker could not have known "that [her] conduct violated the nebulous right of family integrity," and affirmed the caseworker's qualified immunity *Id*. at 1218.  In *Kiser*, the Fifth Circuit again found that social workers were entitled to qualified immunity, even though they persisted in investigating allegations of child abuse after uncovering evidence that conclusively showed that the child's father, the subject of their  investigation, could not have caused the child's unexplained injuries.  Although the investigation of the father continued for half a year, the court determined that the social workers were entitled to qualified immunity.  67 F.3d at 1173.

received only one day of training on the device, failed to conduct any reliable tests to determine her own influence on the child's output, and produced these allegations during her first attempt to use the device with any student.  Moreover, the child was unable to read, did not know the full alphabet, and did not replicate such results with other facilitators using the same device.  The court noted that the device is patently useless for individuals who cannot read or write, like the four year-old in *Morris*.  Although it was "abundantly clear" to a TDPRS employee and a sheriff's deputy that the teacher was producing the messages, TDPRS removed the child from her parents' custody and initiated a suit to terminate parental rights permanently.  *Id*. at 663.  Despite examinations by two physicians that revealed no evidence of sexual abuse, the child remained in TDPRS custody and continued to participate in "Facilitative Communication" sessions with the teacher that exposed the child to graphic themes of sexual conduct and violence.  The parents did not have custody of their child for three years.

In finding that the teacher was not entitled to qualified immunity, the Fifth Circuit distinguished *Morris* from *Hoderowski*, *Doe*, and *Kiser* because *Morris* involved a teacher rather than child welfare investigators, and involved an effort to obtain permanent termination of parental rights, rather than a temporary removal of a child.  The court stressed that although teachers must report evidence of apparent abuse, a teacher's "primary duty is to teach, not ferret out possible instances of abuse."  *Morris*, 181 F.3d at 671.  In addition, the court noted that the teacher's fabrication of evidence constituted the first instance of any evidence suggesting abuse. The court concluded that:

> plaintiffs allege that [the teacher] fabricated the evidence of
> abuse in the first instance with no prior indication from any
> other source that abuse had occurred.  Thus, although child
> welfare agents who (over)zealously follow up independent
> reports of child abuse may not have been on notice in 1992 that
> their actions violate the constitutional right of the families
> involved, it can certainly come as no surprise to . . . a teacher,
> that she was not free to manufacture from whole cloth evidence
> of sexual abuse.

181 F.3d at 671.

The Fifth Circuit identified a continuum in such cases, which balances the state's

interest in protecting children and a family's interest in the privacy of its own relationships:

> When the facts of a case place it in the center of the continuum
> where the two interests overlap and create a tension, the right to
> family integrity may properly be characterized as nebulous, and
> thus a defendant may claim the protection of qualified immunity.
> However, when the facts of a case place it squarely on the end of
> the continuum where the state's interest is negligible and where
> the family privacy right is well developed in jurisprudence from
> this circuit and the Supreme Court, a defendant's defense of
> qualified immunity, based on a claim that the right to family
> integrity was not clearly established, will fail.

181 F.3d at 671.  The court found that the plaintiffs' claims fell "squarely within the well-

established right to family integrity."  The contours of that right left no doubt that a teacher

was not "free to fabricate sexual abuse allegations against her student's parents." *Morris*, 181

F.3d at 675.   No teacher could not have believed that such conduct was objectively

reasonable.  The court denied summary judgment on qualified immunity and left it to the fact

finder at trial to resolve the causation issue by determining the extent to which state officials

relied on the teacher's misrepresentations in deciding to remove the child from her parents' custody.  *Id*. at 672–73.

At what point in the continuum described in *Morris* does this case fit? This case is not as clear a case of fabricated accusations of abuse as *Morris*, but there are unexplained discrepancies that plaintiffs argue support an inference of fabricated evidence of abuse.  The present case is different from *Morris* in critical respects.  Like *Morris*, it involves a teacher's report of suspected sexual abuse of a student by a parent.  Like *Morris*, this case involves a state-initiated termination proceeding, although it was brief.  Unlike *Morris*, this case involves a temporary removal of a child from her home for a relatively short period while the report was investigated, rather than a lengthy stay in foster care.  Both this case and *Morris* involve suspected abuse victims who were unable to speak for themselves, in *Morris* because the child was electively mute and in this case because of retardation.  Like *Morris*, this case involves allegations that the teacher fabricated evidence of sexual abuse.  But in *Morris*, the claim was that the teacher deliberately invented the possibility of abuse and manufactured all the supporting evidence.  In the present case, it is not disputed that the teacher observed Denise exhibit certain behaviors that appeared to be sexual and led to the initial suspicion of abuse. The parties do dispute whether the teacher fabricated evidence to support that suspicion.

The Martins argue that the discrepancies between the date Saberi identified as the date of her report to CPS – October 10, 2003 – and the date CPS recorded – October 2, 2003 – and between the information Saberi asserts she communicated to the mother about Denise's behaviors and the information the mother asserts she received support the argument that

Saberi fabricated the evidence she conveyed to CPS to support the accusation of child abuse. According to the Martins, Saberi stopped exchanging the communication book with them after the October 10, 2002 ARD meeting.  When Mrs. Martin asked Saberi for the book, Saberi returned it with the written pages missing.  When Mrs. Martin asked Saberi for the missing pages, Saberi returned them with at least one additional page of supplemental daily notations that, as the Martins argue, "now tended to support the allegation of child abuse." (Docket Entry No.1, ¶ 38.) The additional page includes an entry for September 9, 2002  that notes that "Denise has a few bruises on her left upper thigh."  (Docket Entry No. 1, Ex. O.) The supplemental entry for September 13, 2002 states, "Denise grabbed Ericka by the neck and she pulled Ericka towards her and stuck out her tongue to kiss Ericka." (*Id*.)  Additional notes for later days in September record that "Denise opened her legs wide and played with herself;" "Denise pulled off her shirt;" and "Denise threw a couple of tantrums." (*Id*.)  All of these daily entries are written in Saberi's handwriting, and four of them include her signature.  The parties' submissions do not explain or provide any additional details about these supplemental entries.  Although the Martins point out the unusual nature of the extra notes, which provide additional observations for previous entries in a new format on a new page, none of the FBISD defendants explains the page's origin.  It is unclear at this stage whether Saberi kept the supplemental notes concurrently with her regular daily entries in the communications book, or if she wrote them on later dates.

In her affidavit, Saberi claims that she notified CPS of her suspicions of sexual abuse on October 10, 2002.  (Docket Entry No. 22, Ex. A.)  Haywood's affidavit in the SAPCR

indicates that CPS received a report on the Martins on October 2, 2002.  (Docket Entry No. 1, Ex. R.)  Moreover, a police report included as an exhibit in the Martins' Original Complaint indicates that CPS referred the Martins' case to the Fort Bend County Sheriff's Office on October 3, 2002.  (Docket Entry No. 1, Ex. U.)  The Martins allege that Saberi presented false testimony in her affidavit and that she is the unknown informant who called CPS on October 2, 2002.

The Martins note that Saberi did not comment on any redness or rawness in Denise's vaginal area in the communications book until October 15, 2002, after the ARD meeting and after Saberi notified CPS of her suspicions of sexual abuse.  The comment appears in the regular daily entries that resumed after a brief hiatus in the exchange of the communications book.  (Docket Entry No. 1, Ex. K.)  The Martins also assert that they called Haywood immediately and asked her to come and examine Denise.  (Docket Entry No. 1, ¶ 42.)  According to the Martins, Haywood agreed that Denise was not red or raw after examining her.  (*Id*.)  Haywood's answer admits that she believed Denise was not "raw," but denies that she agreed that Denise was not "red."  (Docket Entry No. 7, ¶ 42.)  In her affidavit, however, Saberi asserts that she noticed that Denise was "red and raw in her private area" before October 15, 2002.  (Docket Entry No. 22, Ex. A.)  It is unclear from the affidavit when Saberi first noticed the irritation, but the chronology of the affidavit suggests it was between October 2 and October 10, 2002.  Saberi's motion for summary judgment includes the "red and raw" observation as one of several reasons why Saberi suspected sexual abuse and notified CPS on October 10, 2002.  (Docket Entry No. 25, 13.)

The summary judgment record makes it clear that Delagarza's role was limited.  She did not communicate with the Martins and the only information as to her communication with investigating officers is that she provided physical evidence (the hairs) that she had collected when she was asked to do so.  There is nothing in the record to suggest that Delagarza did anything other than follow the instructions given her by Saberi and, later, investigating officers.  Summary judgment as to Delagarza is appropriate.

Defendants present no explanation for the difference in the dates of the report to CPS, for the added pages to the communications book, for the dates of certain observations Saberi reported, or for the differences between the questions Saberi says she asked Connie Martin about Denise's behaviors and the questions Connie Martin says she received.  Without added information, this court cannot identify what disputes in the summary judgment evidence are genuine or whether they are material to determining qualified immunity.  Limited discovery on Saberi's qualified immunity is appropriate.

## IV.    Conclusion and Order

This court grants the TDPRS motion to dismiss; grants the motions to dismiss the damages and declaratory relief claims against the individual TDPRS employees in their official capacities; denies the motions to dismiss the prospective injunctive relief claims against the individual TDPRS employees in their official capacities; grants the motion for summary judgment as to FBISD, Betty Baitland, and Ericka Delagarza; and does not decide the motion for summary judgment as to Christine Saberi.  The parties are to appear for a scheduling conference on **September 9, 2005, at 9:00 a.m.** to determine the discovery

appropriate to resolve qualified immunity issues and to set a motion and briefing schedule.

SIGNED on August 30, 2005, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge