# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| LANCE MARTIN and CONNIE MARTIN, individually and as next friend to DENISE LYNN MARTIN,<br><br>Plaintiffs,<br><br>v.<br><br>TEXAS DEPARTMENT OF PROTECTIVE AND REGULATORY SERVICES, *et al.,*<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-04-4160 |

## MEMORANDUM AND OPINION

Lance and Connie Martin sued the Texas Department of Protective and Regulatory Services ("TDPRS" or "CPS"), the Fort Bend Independent School District ("FBISD"), and a number of TDPRS and FBISD employees. The Martins alleged that the one-month removal of their daughter, Denise, from their home based on a teacher's report of suspected sexual abuse violated federal and state constitutional rights, as well as state statutory and common law. TDPRS and the individually-named TDPRS employees, Thomas Chapmond, Karen Sheehan, Sherrece Haywood, Amy Odin, and Janie Hughes have moved to dismiss the Martins' claims against them on the basis of sovereign immunity. (Docket Entry Nos. 4, 7, 8, and 9.) In a previous Memorandum and Opinion, this court granted the TDPRS motion to dismiss, and granted in part and denied in part the TDPRS employees' motion to dismiss. The FBISD and its superintendent, Betty Baitland; Denise's teacher, Christine

Saberi; and Denise's teacher's aide, Ericka DeLaGarza, also moved for summary judgment. (Docket Entry No. 22).   This court granted FBISD's, Betty Baitland's, and Ericka DeLaGarza's motions for summary judgment.  (Docket Entry No. 26).  This court reserved judgment on Christine Saberi's motion for summary judgment and permitted additional, limited discovery to clarify the record.  (*Id.*).  Saberi has filed a motion to supplement the summary judgment record and a motion to reconsider the ruling on the motion for summary judgment, (Docket Entry Nos. 27, 28), to which the plaintiffs have responded, (Docket Entry No. 36), and Saberi has replied, (Docket Entry Nos. 37, 38).  Additionally, CPS defendants Haywood, Odin, Hughes, Sheehan, and Chapwood have filed a motion for summary judgment based on qualified immunity, (Docket Entry No. 35), to which the plaintiffs have responded, (Docket Entry No. 39).

Based on the pleadings, the motions, the parties' submissions, the record, and the applicable law, this court grants Saberi's motion to supplement the record and the motion for reconsideration; grants the motions for summary judgment; and by separate order, enters final judgment in favor of the defendants.  The reasons for these decisions are set forth below.

## I.      Factual and Procedural Background

Plaintiffs' Original Complaint and this court's previous Memorandum and Opinion set out a detailed account of the events and communications at issue.  (Docket Entry Nos. 1, 26).  The relevant facts are reiterated below as useful for analyzing each motion.

**II.     The Motions for Summary Judgment**

      **A.     The Summary Judgment Standard**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  The nonmovant must do more than show that there is some metaphysical doubt as to the material facts.  *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 255; *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

### B.      The Qualified Immunity Standard

"Qualified immunity protects officials in the course of performance of their discretionary duties unless their conduct violates a 'clearly established [federal] statutory or constitutional right[ ] of which a reasonable person would have known."  *Gutierrez v. City of San Antonio*, 139 F.3d 441, 445 (5th Cir. 1998) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (alterations in original); *see also Anderson v. Creighton*, 483 U.S. 635, 637 (1987); *Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir. 1997); *Warnock v. Pecos County*, 116

F.3d 776, 781 (5th Cir. 1997).  To determine if qualified immunity applies, the district court must follow a two-step process.  First, the court must determine whether the plaintiff has asserted a violation of a clearly established constitutional or statutory right.  *See Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998); *Gutierrez*, 139 F.3d at 445 (*citing Siegert v. Gilley*, 500 U.S. 226, 231 (1991)); *Colston*, 130 F.3d at 99 (*citing Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994)); *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996).  If an official has violated a person's federal civil rights, the second analytical step is to determine whether the official's actions were objectively reasonable.  *See Gutierrez*, 139 F.3d at 445; *Morin*, 77 F.3d at 120; *see also Anderson*, 483 U.S. at 639.

The issue in the second analytical step is "whether a reasonable person would have believed that his [or her] conduct conformed to the constitutional standard in light of the information available . . . and the clearly established law."  *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000).  The objective reasonableness of the official's conduct is measured with reference to the law as it existed at the time of the conduct in question.  *See Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994).  "The subjective intent of the public official is irrelevant, and the official's knowledge of the relevant law need not rise to the level of a 'constitutional scholar.'"  *Swyden*, 139 F.3d at 466 (*quoting Harlow*, 457 U.S. at 815–17).  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *See Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994) (*citing Anderson*, 483 U.S. at 639).  "The qualified immunity defense 'gives ample room for mistaken judgments by protecting all but the plainly

incompetent or those who knowingly violate the law.'"  *Gibson v. Rich*, 44 F.3d 274, 277

(5th Cir. 1995) (quoting *Hunter v. Bryant*, 502 U.S. 224, 226 (1991)).

> ### C.      Saberi's Motion for Summary Judgment

Christine Saberi was the teacher of Denise's special-needs public school class.  As

noted in the earlier Memorandum and Opinion, Denise is nine years old, autistic, nonverbal,

and not toilet trained.  She is also a friendly child who interacts with others and gives and

receives expressions of friendship and affection.  Saberi made three reports to CPS of her

suspicion that Denise was a victim of sexual abuse.  The Martins alleged a number of causes

of action, including substantive due process violations of their right to family integrity.

Saberi has moved for summary judgment based on qualified immunity.

The threshold issue is whether the Martins have stated a claim for a violation of a

constitutional right.  In the previous Memorandum and Opinion, this court determined that

the Martins alleged the denial of a constitutional right because they alleged that Saberi made

a false report to CPS.

The second analytical step is to determine whether the teachers' actions were

objectively reasonable.  *See Gutierrez*, 139 F.3d at 445; *Morin*, 77 F.3d at 120; *see also*

*Anderson*, 483 U.S. at 639.  The issue in the second analytical step is "whether a reasonable

person would have believed that his [or her] conduct conformed to the constitutional standard

in light of the information available . . . and the clearly established law."  *Goodson v. City*

*of Corpus Christi*, 202 F.3d at 736.  The Fifth Circuit has recognized that the formulation of

the right to family integrity can be vague and overly-generalized, and as a result, "reasonable

government officials, knowing only that they must not infringe on family integrity, would not necessarily know just what conduct was prohibited." *Kiser v. Garrett*, 67 F.3d 1166, 1172 (5th Cir. 1995) (quoting *Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir. 1988)). Similarly, the Fifth Circuit noted in *Doe v. State of Louisiana* that the right to family integrity has a "nebulous nature."  2 F.3d 1412, 1417 (5th Cir. 1993).  In *Kiser*, the court stated that the contours of a substantive due process right to family integrity "are not well-defined, and continue to be nebulous, especially in the context of a state's taking temporary custody of a child during an investigation of possible parental abuse." 67 F.3d at 1173.  Accordingly, the Fifth Circuit has affirmed district-court decisions recognizing qualified immunity for state actors whose reports or investigations of complaints of suspected child abuse result in the temporary removal of a child from her parents' custody.  In these cases, the Fifth Circuit recognized that  social workers investigating suspected child abuse are entitled to qualified immunity, even in the face of evidence that the social workers unnecessarily prolonged an investigation, threatened parents with removal of their children, and even misled families about the danger facing their children. *See, e.g.*, *Hodorowski*, 844 F.2d at 1217; *Kiser*, 67 F.3d at 1173.

The Fifth Circuit has identified a continuum in such cases, which balances the state's interest in protecting children and a family's interest in the privacy of its own relationships:

> When the facts of a case place it in the center of the continuum where the two interests overlap and create a tension, the right to family integrity may properly be characterized as nebulous, and thus a defendant may claim the protection of qualified immunity. However, when the facts of a case place it squarely on the end of

> the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court, a defendant's defense of qualified immunity, based on a claim that the right to family integrity was not clearly established, will fail.

*Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999).  In *Morris*, the court found that the plaintiffs' claims of a teacher's deliberate fabrication of abuse allegations, fell "squarely within the well-established right to family integrity."  The contours of that right left no doubt that a teacher was not "free to fabricate sexual abuse allegations against her student's parents."  *Morris*, 181 F.3d at 675.  No teacher could have believed that such conduct was objectively reasonable.  The court denied summary judgment on qualified immunity and left it to the fact-finder to resolve the causation issue at trial, by determining the extent to which state officials relied on the teacher's misrepresentations in deciding to remove the child from her parents' custody.  *Id*. at 672–73.

In the present case, this court withheld judgment on this step of the inquiry as to Saberi because of unexplained discrepancies in the previous summary judgment record.  This court allowed limited, additional discovery to permit the parties to supplement the summary judgment record on this issue.  In the previous Memorandum and Opinion, this court identified the following discrepancies: differences in the dates of Saberi's report to CPS, for the added pages to the communications book, for the dates of certain observations Saberi reported, and the differences between the questions Saberi says she asked Connie Martin about Denise's behaviors and the questions Connie Martin says she received.  Although the parties continue to disagree about some of the underlying facts, none of those disputes of fact

are *material* to determining whether no reasonable teacher in Saberi's position would have

reported suspicions of sexual abuse to CPS.

In an amended affidavit, Saberi clarifies her testimony:

> As [Denise]'s teacher, I became concerned about some of the behaviors [Denise] engaged in while in class. These behaviors included her inappropriately touching herself and other staff members under their shirts and skirts, removing her clothes in class, throwing herself on the floor and spreading her legs, and grabbing a staff member by the neck in an attempt to "French" kiss her. I recorded my observations about [Denise] in a personal log book, which was separate and apart from the communications book that I sent home with [Denise] on a daily basis for her parents' review. I recorded the observations in my personal log book on the date that I observed them. Although I did not intend to share a copy of my personal log book with Connie Martin, [Denise]'s mother, I inadvertently sent a copy of my personal log book to her when she requested a copy of the communications book during the CPS investigation. I never made any entries in my personal log book after the date of the observation, but rather made all entries in my personal log book concurrently with the observation that I recorded. . . . Although I continued to communicate with [Denise]'s parents between October 4, 2002 and October 21, 2002, I am not in possession of any entries from the communications book during this time period. I believe that I sent these entries home with [Denise] but they were never returned by [Denise]'s parents.

> On October 2, 2002, I sent [Denise] to the school nurse when I noticed a red mark on her breast that had the appearance of a hickey. That day, I contacted CPS and reported my suspicion that [Denise] was the victim of sexual abuse. My suspicion that [Denise] was the victim of sexual abuse was based upon the sexual acting out that I witnessed in class and the appearance of a hickey on [Denise]'s breast.

> On October 10, 2002, I participated in an Administrative Review and Dismissal Committee meeting regarding [Denise]'s behavior. A school psychiatrist, social worker, and [Denise]'s

mother participated in this meeting with me.   During this meeting, I expressed my concern regarding [Denise]'s behavior with her mother, but her mother could not provide adequate explanations for the inappropriate behavior.

On October 15, 2002, I noticed that [Denise] was red and raw in her private area.  Ericka De la Garza also discovered hairs when cleaning her after she went to the bathroom.  That day, I again contacted CPS to report my suspicion that [Denise] was being sexually abused.  My basis for contacting CPS on October 15, 2002 was the sexual acting out in class that I observed, the presence of the hairs on [Denise], and my observation that she was red and raw in her private area.  On October 28, 2002, Ms. De la Garza again found hairs in [Denise]'s pull-up diaper.  Based on this finding of additional hairs, I contacted CPS that day to report my suspicion that [Denise] was the victim of sexual abuse.   My October 28, 2002 report was the third time I contacted CPS regarding [Denise].

(Docket Entry No. 27, Ex. 1 at ¶¶ 4–7).  This testimony addresses the inconsistent dates of the log book: they are a product of the intermingling of Saberi's personal notes on Denise, which Saberi did not send home each day, and the school notes, which were sent home every day. Saberi's affidavit also clarifies that she contacted CPS on three different occasions and why.

The Martins had the opportunity to depose and cross-examine Saberi.  They claim that disputed facts persist, material to an overarching claim that Saberi manufactured evidence of abuse.  The Martins point to several discrepancies that remain in the supplemented record. In Saberi's original affidavit, she testified that she contacted CPS after Connie Martin was unable to provide a satisfactory explanation for Denise's behavior.  In the amended affidavit, however, Saberi testifies that she first contacted CPS after she noticed Denise's strange behavior, before any discussion with Connie Martin.  The discussion with Connie Martin

10

about Saberi's suspicions did not occur until the ARD meeting, after which Saberi again contacted CPS. The Martins also point to Saberi's testimony that she did not know specifically what caused the red mark that she nonetheless cited as a reason she first called CPS.

Neither of these discrepancies creates a material issue of fact. The Martins do not controvert the evidence that the teachers saw Denise exhibit seemingly sexual behavior before Saberi placed any calls to CPS. The Martins do not dispute that Denise had a red mark on her breast that Saberi saw. In light of Denise's "acting out" and the mark, this court cannot say that no reasonable teacher in Saberi's position would have notified CPS of her concerns.

Unlike *Morris*, in which the teacher fabricated all of the evidence of abuse, the undisputed summary judgment record reveals that Saberi made observations that reasonably led her to contact CPS. Additionally, in *Morris*, the court noted that evidence that the teacher played a role "not limited to that of a mere reporter of suspected abuse. She allegedly created false evidence that was presented to the state court judge and to child welfare officials in the first instance. She then continued to create false evidence after Hillary [the child] was removed from the home and any emergency had passed, in violation of specific instructions to discontinue the sue of FC with Hilary, in an attempt to further influence the results of the state process." 181 F.3d at 673. This description is far from the facts of this case. Saberi noted Denise's unusual behavior and red mark. She initiated a meeting with other personnel and the Martins and contacted CPS. She observed other possible indications of abuse — irritation in the genital area and hairs in Denise's diaper — that deepened her concerns. Other

officials investigating Saberi's concerns corroborated them and agreed that abuse may have taken place.  A medical exam of Denise further corroborated Saberi's claims.  A reasonable teacher in Saberi's shoes who observed similar conduct and physical indicators of abuse could have contacted CPS.

The Martins further contend that Saberi's notes were not made contemporaneously with her observations and that parts of the notebook conflict with her deposition testimony.  Specifically, Connie Martin disputes that on September 30, 2002, she told Saberi that Denise "has been afraid to go to her bedroom."   Additionally, the Martins contend that Saberi contradicted herself by first testifying that on October 1, 2002, Denise's father was "acting abusive," which made Denise upset, and then testifying in her deposition that it was possible that Denise was already agitated before her father arrived.  These differences are not material to the qualified immunity defense.  The defense does not rest on whether Connie Martin told Saberi of Denise's changed attitude toward her bedroom.  The testimony as to the events on October 1 indicates that there could be alternative explanations for Denise's agitation on that date.  The Martins attempt to bolster this claim by pointing to Saberi's notes from the previous day, September 30, 2002.  On that day, Saberi recorded that Denise "was calm when her mom arrived."  In her deposition, Saberi consistently testified that Denise's mother picked the child up from school on September 30, and her father picked her up on October 1.  The undisputed testimony that Denise was calm the day she left with her mother and agitated the day she left with her father is consistent with Saberi's argument that her suspicions of abuse by the father — although ultimately unproven — were reasonable given her observations.

The Martins argue that although Saberi claimed to observe that Denise was "red and raw in her private area" and that hairs were found in her diaper, and that those observations influenced her decision to call CPS, Saberi's testimony does not indicate that she made either of these observations until October 15, 2002, nearly two weeks after Saberi's first call to CPS. The record does not support the Martins' argument.  When Saberi called CPS on October 2, she predicated her suspicions on Denise's behavior and the red, "hickey"-like bruise on her chest.  The later call to CPS was based on the later observations.  In light of the requirements under state law and school policy that Saberi notify CPS of suspected child abuse, the Martins have failed to meet their burden that *no* reasonable teacher in Saberi's position would have reported her observations and concerns to CPS.  *See, e.g.*, *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001) (qualified immunity remains unless *all* reasonable officers would have behaved differently than the officer-defendant).  Accordingly, summary judgment in Saberi's favor is appropriate.   Saberi's motion to supplement the record and her motion for reconsideration of her motion for summary judgment are granted.

### D. The CPS Defendants' Motion for Summary Judgment

The CPS Defendants, Thomas Chapmond, Sherrece Haywood, Karen Sheehan, Amy Odin, and Janey Hughes, have filed a motion for summary judgment based on qualified immunity as to the federal claims and based on the parallel doctrine of official immunity as to the state-law claims against them. (Docket Entry No. 35).  The Martins' allegations against these defendants relate to the decisions made and the acts taken in removing Denise from her

home.  The Martins have alleged, *inter alia*, violations of the Fourth Amendment, civil conspiracy, malicious prosecution, and deliberate indifference by this group of defendants.

Betty Jane "Janey" Hughes supervised Haywood and Odin.  Russell supervised Hughes.[1]  (Docket Entry No. 35, Ex. 5, ¶ 4).  Hughes heard that Denise's teacher was "seriously concerned about her behavior at school and appeared genuinely convinced that sexual abuse was taking place."  (*Id.* at ¶ 6).  On October 18, 2002, Hughes talked to a nurse who conducted a medical exam of Denise.  The nurse indicated that the physical evidence made her "suspicious" of sexual abuse.  Hughes testified that despite this information, she and Russell "were not willing to authorize an emergency removal of [Denise] from her parent's home based on the oral transmission of information that was categorized as a 'suspicion.'" (*Id.*).  They wanted to wait for the written report because in Hughes's experience, "written medical reports were often less[2] specific, definitive, and authoritative than oral reports or comments communicated to [CPS] after a medical examination of this kind, and we wanted to see what the complete written report stated before making a final decision on removal." (*Id.*).  CPS and the Martins agreed upon an "interim plan . . . to leave [Denise] in the home on the condition that her grandmother would come to stay with the family and that Denise would not be left unsupervised with either parent."  (*Id.*).

---

[1]  Chapmond is the Executive Director of the TDPRS and, accordingly, played no personal role in the incident at the center of this case.  (Docket Entry No. 35, Ex. 9).

[2]  Based on the context of this statement, Hughes obviously meant to testify that medical reports are often *more* specific, definitive, and authoritative than oral reports or comments communicated to CPS.

According to Hughes, the written report received on October 29, 2002, "not only confirmed that there was actual evidence of sexual abuse, but also provided details of this evidence: a deep notch in the child's hymen at 3 o'clock. The medical professional who examined [Denise] also confirmed us that due to her autism [Denise] was not coordinated enough to inflict a penetrating injury of this kind upon herself." (*Id.*). The Martins contest this characterization of the report, contending that the written report shed no new light on the facts of the case. Nonetheless, according to Hughes, "[i]t is somewhat rare to actually have physical evidence of abuse of this kind, and it was particularly persuasive to us in light of Denise's reported behavior and her inability to tell us what was happening to her." (*Id.* at ¶ 8). Based on this information, Hughes authorized Haywood and Odin to remove Denise from the home, on an emergency basis.

According to the Martins, on Tuesday, October 29, 2002, Haywood and Odin arrived at the house around 7:00 p.m. (Docket Entry No. 39, Ex. 1, ¶ 3). Lance Martin was at home with Denise; Connie Martin was not.[3] Haywood or Odin knocked on the door. Martin opened it. Both women "swept past" Martin without asking his permission to enter. (*Id.*). As Haywood walked past Martin, she told him to call his wife. When Martin asked why, Haywood explained that she and Odin had come to take Denise. (*Id.* at ¶ 4). According to Martin, Haywood explained that the results of the medical test confirmed that Denise had

---

[3]     Presumably, Denise's grandmother was also in the home under the interim plan between the Martins and CPS. (*See* Docket Entry No. 35, Ex. 5-A). Martin testified that during this incident, the family's dogs remained in the kitchen and dining room. (*Id*. at ¶ 8). The dogs had been put away because Betty Morrison, Martin's mother-in-law, had been staying at the home as part of the "safety plan" to which the Martins had previously agreed with CPS. (*Id*.).

been sexually assaulted.  Martin claims that he told Haywood that she knew this information from talking to the examining nurse eleven days before and that the CPS officers could not take Denise away.  (*Id.*).  Martin contends that Odin responded that he was "lucky that we're not taking both your children."  (*Id.* at ¶ 5).  Feeling threatened by this statement, Martin claims that he stopped resisting out of fear that CPS would take away his son, too.  When Connie Martin arrived, Odin allegedly repeated her threat that the Martins were lucky CPS was not removing both children.  (*Id.* at ¶ 7).

The CPS employees dispute much of this account.  Haywood asserts that her supervisors did not believe they had sufficient information to remove Denise from her parents' home before the written medical report.  (Docket Entry No. 35, Ex. 1, ¶ 3).  When Haywood and Odin went to the Martin home, Haywood claimed that the Martins were cooperative and specifically denies that Odin threatened the Martins in any way.  (*Id.* at ¶ 12–13).  Odin similarly denied threatening the Martins with the removal of their son.  (Docket Entry No. 35, Ex. 3, ¶ 9).  Instead, Odin claimed that Martin was "quite friendly" when they arrived at the house.  Odin claimed that she and Haywood "were allowed into the home without any incident or protest whatsoever."  (*Id.*).  Indeed, Odin asserts that Martin went to put the family dogs away because he knew Haywood was afraid of them. Martin contradicts this, stating that the dogs were already in the kitchen and dining room and did not need to be removed from the scene.  Contrary to Martin's account, Odin testified that she suggested that he call his wife and reassured him that they would wait until she returned home to say goodbye to Denise.  (*Id.* at ¶ 8).  According to Odin, the two CPS officials waited over an

hour for Connie Martin to come home and then stayed at the house an additional hour to complete the paperwork and allow the Martins to spend time with Denise before she was taken away. (*Id.*). Instead of implicitly threatening to take the Martins' son from them, Odin asserts that she told Martin that "in cases of suspected child abuse, the agency's standard procedure is to remove all of the children from the home in an emergency removal situation," but assured him that in this case "that would not happen." (*Id.* at ¶ 9). Odin claims that she did not intend this statement as a threat and that if Martin perceived it as such, he misunderstood.

On October 30, 2002, the district court of Fort Bend County, Texas held a hearing on the emergency removal of Denise from her home. (Docket Entry No. 35, Ex. 7-A). The court upheld the CPS workers' actions. The court found that Denise had been a victim of sexual abuse and faced a continuing danger in her home. (*Id.*); *see also* TEX. FAM. CODE ANN. § 262.102 (Vernon's 2002). The court concluded that the CPS decision not to provide predeprivation notice and a hearing was justified under the Family Code. A full adversarial hearing was scheduled for November 6, 2002, with the parties required to attend mediation on November 5, 2002. (*Id.*). At the parties' request, the court rescheduled the mediation for November 18, 2002 and rescheduled the adversarial hearing for November 20, 2002. (Docket Entry No. 35, Ex. 7, ¶ 6). As part of the mediation process, the parties agreed that Lance Martin would take a polygraph test. (*Id.* at ¶ 7). After Martin passed the test, CPS nonsuited the case. The adversarial hearing never took place. (*Id.* at ¶ 8). There is no indication that CPS made any further investigation into whether Denise may have been sexually abused

outside her home, nor that CPS took any steps to investigate their suspicions of abuse besides requiring Martin to take a polygraph.

### 1.    The Claim of Interference with Family Relations

The Martins allege that the CPS defendants intentionally interfered with their constitutionally-protected family relations. (Docket Entry No. 1, ¶ 88). This court's previous Memorandum and Opinion discussed the contours of this standard, focusing on a teacher's alleged interference with this right, rather than alleged interference by CPS officials. The present inquiry is slightly different.

The right to family integrity is a substantive due-process right. The Fifth Circuit has endorsed the "shocks the conscience" test for violation established in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).[4]  The first step is to determine "whether the behavior of the

---

[4]    The State of Texas also recognizes the importance of family integrity through the narrowly-circumscribed procedures under which a CPS worker may remove a child from her parent's custody without a court order:

> If there is no time to obtain a temporary restraining order or attachment before taking possession of a child consistent with the health and safety of that child, an authorized representative of the Department of Protective and Regulatory Services, a law enforcement officer, or a juvenile probation officer may take possession of a child without a court order under the following conditions, only:
>
>> (1) on personal knowledge of facts that would lead a person of ordinary prudence and caution to believe that there is an immediate danger to the physical health or safety of the child;
>>
>> (2) on information furnished by another that has been corroborated by personal knowledge of facts and all of which taken together would lead a person of ordinary prudence and caution to believe that there is an immediate danger to the physical health or safety of the child;
>>
>> (3) on personal knowledge of facts that would lead a person of ordinary prudence and caution to believe that the child has been the victim of sexual abuse;
>> (4) on information furnished by another that has been corroborated by personal

governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Morris*, 181 F.3d at 668 (quoting *Lewis*, 523 U.S. at 847 n.8). "If this standard is met, a court must next determine whether there exist historical examples of recognition of the claimed liberty protection at some appropriate level of specificity." *Id.*

The Martins have failed to raise a fact issue as to whether CPS workers' actions violated the right to family integrity. The evidence in the summary judgment record does not support an inference that the CPS defendants' conduct was so outrageous and egregious that it "shocks the conscience." There is no dispute that Denise's teacher had called CPS three times to relay accounts of suspicious behavior by, and marks on, Denise. There is no evidence — or even an accusation — that any of the CPS defendants questioned Saberi's accounts. CPS conducted an investigation that included a medical evaluation of Denise before taking any action. The medical evaluation corroborated and supported the suspicions of abuse. On the date the officers decided on an emergency removal, the medical examiner confirmed in writing that she had found a notch on Denise's hymen that Denise could not have inflicted on herself. (Docket Entry No. 35, ¶ 7) Based on these undisputed facts, even assuming the truth of the Martins' account as to the disputed facts, the CPS defendants' temporary removal of Denise from the Martins' home under established CPS and statutory procedures (including a postdeprivation hearing the following day and notice and an

---

knowledge of facts and all of which taken together would lead a person of ordinary prudence and caution to believe that the child has been the victim of sexual abuse....

TEX. FAM. CODE ANN. § 262.104 (Vernon's 2002).

opportunity for a more developed, adversarial hearing to follow shortly) does not "shock the conscience."  The CPS workers may have been negligent and insensitive in removing Denise from her home when and how they did.  But negligence and insensitivity are not a sufficient basis for the substantive due-process claim of interference with family relations.  *Accord Lewis*, 523 U.S. at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *compare Rochin v. California*, 342 U.S. 165, 172–73 (1952) (holding that the forced pumping of a suspect's stomach to verify whether the suspect had used drugs "shocks the conscience"); *Breighaupt v. Abram*, 352 U.S. 432, 435 (1957) (holding that taking blood from a suspect while he was unconscious after an automobile accident to determine if the suspect was intoxicated "shocks the conscience").

The defendants' motion for summary judgment on this claim is granted.

## 2. The Claim for the Removal of the Child from Parental Custody Without Hearing

The Martins allege that the CPS defendants violated their procedural due-process rights under the Fourteenth Amendment by removing Denise without first affording her parents a hearing.  (Docket Entry No. 1, ¶ 92).  The Supreme Court has held that parental rights cannot be denied without an "opportunity for them to be heard at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  A procedural due-process claim requires a two-part analysis.  First, the court determines whether the defendants deprived the plaintiff of a protected liberty or property interest.  If the answer is yes, the court assesses what process was due.  *Hamlin v. Vaundenberg*, 95 F.3d 580, 584 (7th Cir. 1996).

There exists "a fundamental liberty interest of natural parents in the care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also Troxel v. Granville*, 530 U.S. 57 (2000); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).  Similarly, a child's right to be raised by her parents is fundamental.  *See Santosky*, 455 U.S. at 760; *Stanley v. Illinois*, 405 U.S. 645 (1972); *Wooley*, 211 F.3d at 923 ("[A] child's right to family integrity is concomitant to that of a parent.").  In deciding procedural due-process claims stemming from official response to allegations of child abuse, "[t]he right to family integrity must be balanced against the state's interest in protecting the health, safety, and welfare of children."  *Wooley*, 211 F.3d at 924 (citing *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Morris*, *supra*, 181 F.3d 657).

Several courts of appeals have held that, absent exigent circumstances, government officials cannot remove a child from her parents' home without an investigation and a predeprivation hearing.  *Brokaw*, 235 F.3d at 1020; *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997) ("Removal of children from the custody of their parents requires predeprivation notice and a hearing except for extraordinary situations where some valid governmental interest is at stake that justified postponing the hearing until after the event."); *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) (permitting seizure followed by a postdeprivation hearing when the child's safety is threatened); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994) ("[O]nly where a child's life is in imminent danger or where there is immediate danger of severe or irreparable injury to the child's health (and prior judicial authorization is not immediately obtainable) may an official summarily assume

custody of a child from his parents."). The Fifth Circuit has implied a similar standard. In *Hodorowksi*, for example, the court cited and discussed *Santosky* and *Stanley* in addressing a procedural due-process claim in a section 1983 suit brought after intervention by CPS. 844 F.2d at 1217. The court distinguished the facts present in *Hodorowski*, which involved a temporary removal of a child from her home, from the Supreme Court cases, which involved a *permanent* termination of parental rights. "It is undeniable that concern for family integrity figured prominently in the Court's rationale in both cases. . . . But it would be a mistake to conclude that, from *Santosky* and *Stanley* alone, the appellants [CPS officials] should have known that taking the Hodorowski children into temporary custody violated a constitutional right. Both cases, for example, involved the state's attempt to sever *permanently* the parent-child relationship. The present case, by contrast, concerns an attempt to obtain only *temporary* custody of the children. This difference alone is sufficient to prevent us from concluding that appellants' conduct violated clearly established law." 844 F.2d at 1217 (emphasis in original). In *Wooley*, the Fifth Circuit embraced a more direct link between procedural due-process rights and the right to family integrity. The court discussed cases involving the intersection of procedural due-process rights and the right to family integrity and held that, because there was no indication of abuse, the child and his mother "enjoyed a clearly established right to maintain their relationship free from interference by state actors." 211 F.3d at 924.

The record here does not support a procedural due-process deprivation claim. Although the CPS officials removed Denise from the home without affording the Martins a

predeprivation hearing, that action was based on the CPS investigation, the information obtained from Denise's teachers, and the medical examination of Denise.  The Martins dispute the veracity and accuracy of some of the CPS's information, but not that the CPS defendants had this information before the emergency removal.  When the CPS officials removed Denise from the home, they had received what they considered to be credible and accurate information from Denise's teacher that the child had come to school with a bruise on her chest that resembled a "hickey," had exhibited sexual behavior, was "raw and red" in her genital area, had strange hairs in her diaper, and that Denise's mother failed to provide adequate explanation.  CPS followed up the teacher's reports with both an oral and then a  written report from a medical examiner supporting a finding of abuse.  The CPS officials had informed the Martins of the status of the investigation and interviewed them on multiple occasions.  Although CPS had the oral report of the medical exam ten days before Denise was removed from the home, Hughes, the CPS supervisor, did not find it appropriate to take emergency action before she obtained written verification of the examiner's oral report. (Docket Entry No. 35, Ex. 5, ¶ 6).  During the intervening ten days, CPS insisted that the mother-in-law be present in the Martins' home.  Once Hughes obtained the specific, written medical findings that corroborated the suspicion of sexual abuse, Hughes felt that immediate removal was warranted.  (*Id.* at ¶ 8 ("It is somewhat rare to actually have physical evidence of abuse of this kind, and it was particularly persuasive to us in light of Denise's reported behavior and her inability to tell us what was happening to her.  Based on all the circumstances, the appropriate action was removal.")).  Critically, the Martins received a

postdeprivation hearing within twenty-four hours.  In light of these undisputed facts, the State's strong interest in protecting children's safety, and the facts that the Martins were afforded a postdeprivation hearing less than twenty-four hours later and the state court ordered a full adversarial hearing within ten days, the Martins cannot prevail on a claim that their procedural due-process rights were violated.  The defendants' motion for summary judgment is granted.

### 3.    The Fourth Amendment Claims

The Martins claim that the CPS defendants violated their Fourth Amendment rights and Denise's Fourth Amendment rights.  This claim targets Haywood and Odin, the defendants who went to the Martins' home to remove Denise.[5]  The conduct of Hughes, who authorized the emergency removal, is also relevant to the Fourth Amendment claim.  *Cf. Brokaw*, 235 F.3d at 1014 ("While [the supervisor] was not present during the actual seizure of [the children], the allegations read in the light most favorable to [the children] indicate that she directed those who removed the children to do so.") (citing *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 859 (7th Cir. 1999); *Morris*, 181 F.3d at 672)).  Although Haywood, Odin, and Hughes moved for summary judgment on all claims, they did not address this issue in their brief.

Under the first step of the qualified immunity test, this court must determine whether the Martins have alleged a valid Fourth Amendment violation. *Hope v. Pelzer*, 536 U.S. 730,

---

[5]       The Martins have failed to create disputed issues of fact material to determining whether the remaining CPS defendants, Sheehan and Chapwood, violated the Martins' constitutional rights.  Summary judgment is granted as to these defendants.

736 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The Fourth Amendment regulates civil investigations conducted by social workers.  *See Roe v. Texas Dep't of Protective and Regulatory Servs.*, 299 F.3d 395, 401 (5th Cir. 2002); *Wooley v. City of Baton Rouge*, 211 F.3d 913, 925 (5th Cir. 2000); *Franks v. Smith*, 717 F.2d 183, 186 (5th Cir. 1983). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971) ("It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'").  "In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 605 (2d Cir. 1999) (additional quotations and internal marks omitted)); *see also Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000)*; J.B. v. Washington County*, 127 F.3d 919, 929 (10th Cir. 1997); *Good v. Dauphin County Social Srvs. for Children and Youth*, 891 F.2d 1087, 1094 (3d Cir. 1989).

The Fifth Circuit has not determined the test for whether a social worker's home visit violates the Fourth Amendment.  *See Roe*, 299 F.3d at 401 (avoiding the question and noting that "[s]electing the applicable tet for a social worker's investigative home visit would be a

question of first impression in this circuit — an issue over which other courts of appeals have divided") (citing cases).  Some courts of appeals apply the "special needs" doctrine, which allows a warrantless search by social services agency workers in cases in which the state demonstrates a "special need" discrete and superior to the general interest in law enforcement. *See Wildauer v. Frederick County*, 993 F.2d 369, 372 (4th Cir. 1993); *see also, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (applying the "special needs" doctrine to a warrantless search of a high school student's purse).  The appropriate test under the "special needs" doctrine is not "probable cause" or "reasonable suspicion," but instead "the standard of reasonableness under all of the circumstances."  *Roe*, 299 F.3d at 404 (quoting *O'Connor v. Ortega*, 480 U.S. 709, 725–26 (1987)).  Other courts apply the same level of scrutiny to social workers as is applied to police officers, requiring either probable cause and a warrant or exigent circumstances. *See Good*, 891 F.2d at 1094–95; *Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999).  Because the Fifth Circuit has not chosen which standard to apply, this court will analyze the record under both standards.

The Martins alleged that Haywood and Odin, at the direction of Hughes, came to their home, knocked on the door, and, after Lance Martin answered, walked past him into the home without obtaining his permission to do so.  Haywood and Odin then told Lance Martin to call his wife and said that they would be taking Denise with them.  When Martin asked why, Haywood and Odin explained that the medical report showed that Denise had been sexually assaulted.  According to Martin, Haywood and Odin had this information eleven days before their unannounced visit.  (Docket Entry No. 39, Ex. A, ¶ 10).  Martin also testified that his

mother-in-law, Betty Morrison, had been living in the Martins' home for a week as part of a

"safety plan" that "Haywood had demanded [the Martins] sign."  (Docket Entry No. 39, Ex.

A, ¶ 8).  The CPS defendants also testified that this plan was in place.  Under the plan, the

Martins agreed that Denise would not be left alone with either parent until the investigation

concluded.  (Docket Entry No. 35, Ex. 5, ¶ 6 & Ex. A).

The Martins have alleged a Fourth Amendment claim against Haywood and Odin

under either the traditional Fourth Amendment test or the less rigorous "special needs" test.

The Martins have alleged that Haywood and Odin entered the Martins' home without

probable cause or exigent circumstances.  *Cf. United States v. Vega*, 221 F.3d 789, 797 (5th

Cir. 2000) (holding that consent is not obtained by a suspect's mere failure to object); *United

States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996) (holding that consent was not obtained when

the officer did not ask permission to search and the suspect did not offer permission to search,

but stood by as the officer conducted the search).  As alleged, the CPS officers had not

obtained information on the afternoon of the emergency removal that they did not have eleven

days before.  Based on the eleven-day-old oral report from the medical examination, Martin,

the suspected offender, could not have been left alone with Denise because of the "safety

plan" implemented by Haywood herself, requiring the grandmother's presence in the home.

The Martins' allegation that there was no emergency that precluded CPS from making a

phone call to receive a court order states a Fourth Amendment claim.

The Martins have alleged a Fourth Amendment violation under the "special needs test"

as well.  As alleged, the CPS workers acted on the basis of the same information they had

received eleven days earlier, in written rather than oral form.  The CPS officers knew that the allegedly abusive parent was not permitted to be alone with Denise.  There was no inquiry into whether the Martins had failed to comply with the "safety plan," nor did the CPS officers claim that they believed the Martins were violating the "safety plan" terms.  The CPS workers had found Lance Martin cooperative throughout the investigation — so cooperative, in fact, that Haywood did not feel that a law enforcement officer would be needed when she came to take Denise away.

Because the Martins have alleged a valid Fourth Amendment claim against Haywood, Odin, and Hughes, this court proceeds with the qualified immunity analysis.  Was the law "clearly established" at the time of the incident, October 29, 2002?  The precise level of Fourth Amendment protection against CPS actions in the Fifth Circuit was — and is — unclear.  In *Roe*, the circuit explicitly reserved the question.  299 F.3d at 401.  But Fifth Circuit law dating back nearly twenty years before this incident did make it clear that CPS officers were subject to the Fourth Amendment.  "A section 1983 action can . . . lie against others, such as social workers, where actions by them were taken in their official capacity as state employees."  *Franks v. Smith*, 717 F.2d 183, 186 (5th Cir. 1983).  That Fourth Amendment protections extended to families visited by CPS workers was clearly established at the time of this incident, October 29, 2002.

Because clearly-established law at the time of the incident fairly informed the officers that their actions were regulated by the Fourth Amendment, this court must determine whether a reasonable CPS worker with the same knowledge and in the same circumstances would have

behaved in the same manner.   Whether Lance Martin consented to the search is hotly contested by the parties.   Because determining whether Lance Martin provided valid consent requires a fact-finder to decide credibility questions, it cannot be the basis for resolution on summary judgment.   Additionally, the summary judgment record does not resolve whether the medical report received by CPS on October 29, 2002 provided new information beyond that provided in the telephone communication with the medical examiner eleven days earlier. If the written report contained new information, exigent circumstances may well have existed.

Even if there is a fact issue as to consent or exigent circumstances, the summary judgment record shows that, as a matter of law, Haywood, Odin, and Hughes are entitled to qualified immunity from liability under the Fourth Amendment.   "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."  *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials — like other officials who act in ways they reasonably believe to be lawful — should not be held personally liable.").   Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Brown*, 243 F.3d at 190 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).   This court need not determine that the officers at issue behaved reasonably; instead, the court need hold only that it "cannot say that all reasonable officers" would have behaved differently in the situation.   *Cf. Brown*, 243 F.3d at 190.

The CPS defendants strain this level of protection very close to the breaking point, but the protection remains.  Hughes, Haywood and Odin's supervisor, did not want CPS to intervene on an expedited basis before receiving the *written* medical evaluation of Denise. There is no dispute that the evaluation corroborated the suspicion that Denise had been sexually abused.  Even assuming that the CPS officials had received the same information orally eleven days before and removed Denise on an emergency basis immediately after receiving the information in written form, the record does not support a conclusion that *no* reasonable officer would have followed this same approach.  The CPS workers allowed Denise to remain in the home after the oral report of the medical examination only under a "safety plan," the presence of the mother-in-law.  Once the medical examiner had time to review the information and reported in writing the same conclusions — Denise showed physical signs of sexual abuse — the CPS officers decided that the confirmed information of the risk to Denise made reliance on the "safety plan" inadequate.  Although a more prudent course of action would have been to obtain a court order and predeprivation hearing before removing Denise, that is not the test.  *See, e.g.*, *Kinney v. Weaver*, 367 F.3d 337, 386 (5th Cir. 2004) ("Immunity shields officials so long as their conduct is reasonable, even though wrong in hindsight.") (citing *Saucier*, 533 U.S. at 205).  Under either a traditional or "special needs" Fourth Amendment analysis, the record shows that a reasonable CPS official could have concluded that intervening on an emergency basis was required to prevent further abuse to Denise.  The law does not require more to confer qualified immunity.  The defendants' motion for summary judgment on the Fourth Amendment claims is granted.

### 4.      The Claim of Illegal Detention (False Imprisonment)

The Martins allege that the CPS defendants falsely detained Denise.  (Docket Entry

No. 1, ¶ 121–22).  To prevail on a section 1983 false imprisonment claim, the plaintiff must

show that the defendants did not have probable cause to arrest him.  *Haggerty v. Texas*

*Southern Univ.*, 391 F.3d 653, 655 (5th Cir. 2004); *Brown*, 243 F.3d at 189.  In the criminal

justice context, probable cause exists if "the totality of the facts and circumstances within a

police officer's knowledge at the moment of arrest are sufficient for a reasonable person to

conclude that the suspect had committed or was committing an offense." *Haggerty*, 391 F.3d

at 655–56 (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001)).  Applying this

cause of action to CPS workers is difficult, considering that the officers allegedly detained a

child as protection from abuse, not a criminal suspect.

The Martins have alleged a valid claim of false imprisonment.  Based on the

allegations, Haywood and Odin lacked probable cause to remove Denise from her home for

the reasons discussed in the Fourth Amendment analysis.

Turning to step two of the qualified immunity inquiry, the CPS defendants prevail.

"Even law enforcement officials who reasonably but mistakenly conclude that probable cause

is present are entitled to immunity." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

Given the information they had been provided, Haywood and Odin reasonably believed that

there was a real and imminent threat to Denise and that the state's interest in preventing abuse

was furthered by removing the child from the home during the investigation.  The state court

agreed, entering an order the following day to allow the removal of Denise from the home on

a temporary basis.  Although this court finds that probable cause did not exist when the CPS defendants removed Denise from the home, the record does not show that the officers' conclusion was unreasonable.  *Cf. Brown*, 243 F.3d at 190 ("[T]here must not even arguably be probable cause for the . . . arrest for immunity to be lost.") (internal citations and quotations omitted).   The defendants' motion for summary judgment on the false imprisonment claim is granted, based on qualified immunity.

### 5.      The Invasion of Privacy Claim

The Martins allege violation of their federal constitutional right to privacy.  (Docket Entry No. 1, ¶¶ 100–04).  "The right to privacy consists of two inter-related strands; one protects an individual's interest in avoiding disclosure of personal matters (the confidentiality strand) and the other protects an individual's interest in making certain personal decisions free of governmental interference (the autonomy strand)."  *Cantu v. Rocha*, 77 F.3d 795, 806 (5th Cir. 1996) (citing *Fadjo v. Coon*, 633 F.2d 1172, 1175 (5th Cir. 1981)).  Both strands of this privacy right are protected by Fourteenth Amendment and the Supreme Court's substantive due-process jurisprudence.  *See generally Zaffuto v. City of Hammond*, 308 F.3d 485, 489–91 (5th Cir. 2002) (juxtaposing this privacy right with the Fourth Amendment's protection of privacy rights).   Although a plaintiff may properly plead a violation of Fourteenth Amendment privacy rights without clearly specifying the claim as such in the complaint, claims arising under the Fourteenth Amendment are treated differently than claims arising under the Fourth Amendment.  *Cf. id.* at 489 n.4 ("[N]othing in the plaintiffs' filings makes clear that they intended to pursue a separate claim under the Fourteenth Amendment

confidentiality branch, in addition to their Fourth Amendment claim.  The complaint speaks

broadly of the constitutional right to privacy, without mentioning a specific amendment. . . .

The Zaffutos' memorandum in opposition to summary judgment only mentions the Fourth

Amendment . . . . Nevertheless, we conclude that the Fourteenth Amendment issue is properly

before us because the Zaffutos' complaint reads broadly enough to cover both theories. . . .").

As in the *Zaffuto* case, the Martins have alleged a broad privacy right-based claim, but

have not specified which amendment they invoke.  The allegations read as follows:

> As a direct and proximate result of Defendants CPS, Chapmond,
> Sheehan, Hughes, Haywood, and Odin's unjustified and unlawful
> invasion of Plaintiffs' privacy, and as a proximate result of
> established policies and customs of CPS as set forth above,
> Plaintiffs suffered loss of privacy as well as the private use of
> their residence.    Furthermore, Plaintiffs have suffered
> humiliation, embarrassment, fear, frustration, and general mental
> anguish, and in all reasonable likelihood they will continue to do
> so for a long time in the future.

(Docket Entry No. 1, ¶ 101).

As in *Zaffuto*, the Martins referred only to the Fourth Amendment in their response to

the motion for summary judgment.  Unlike the *Zaffuto* plaintiffs, however, the Martins'

privacy claim is predicated on allegations identical to their Fourth Amendment violation

claims.  Violations of the Fourteenth Amendment right to privacy usually pertain to

disclosures of confidential facts and information.  The Martins allege that the defendants

invaded their privacy by unlawfully entering their home.  This is a Fourth Amendment claim.

*See, e.g.*, *Silverman*, 365 U.S. at 511.  If the Fourth Amendment "fully embraces the

governmental action complained" of by the plaintiffs, a court "cannot consider [the] plaintiffs'

substantive due process rights." *Roe*, 299 F.3d at 412. The defendants' motion for summary judgment on this claim is granted.

### 6. The Claim of Due-Process Violation Caused by Callous Indifference

The Martins allege that the CPS defendants exhibited callous indifference in the manner in which Denise was placed with foster caregivers. (Docket Entry No. 1, ¶ 117). The Martins allege that during the period of Denise's separation, the foster parents failed to provide Denise with her medication, which caused her injury. (*Id.*).

To recover from child services officials for failure to place a child in an appropriate foster-care environment, the plaintiff must demonstrate that "the defendant state official at a minimum acted with deliberate indifference toward the plaintiff." *Hernandez v. Texas Dep't of Protective and Regulatory Srvs.*, 380 F.3d 872, 881 (5th Cir. 2004) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002)). A state actor acts with "deliberate indifference" if he consciously disregards a known and excessive risk to the victim's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The deliberate indifference inquiry uses a subjective standard: the state actor's actual knowledge, rather than what the actor should have known, controls. *Cf. McClendon*, 305 F.3d at 326. For liability to attach, "the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hernandez*, 380 F.3d at 881 (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998) (additional citations and quotations omitted).

The Martins have failed to create a disputed issue of fact material to whether the CPS defendants were deliberately indifferent to Denise's medical condition.  Haywood provided the following relevant testimony:[6]

> One of my duties as the principal caseworker on Denise's case was to keep in touch with Denise's foster caregivers and deal with any situation that might develop.  In that capacity, I was informed on November 12, 2002 by Denise's foster mother that Denise was almost out of her medication.  Denise had been prescribed Risperal by her neurologist, Dr. Zeller, and I had obtained a bottle of this medication from the Martins when Denise was removed from their home.  I gave the medication to Denise's foster caregivers.  I have no knowledge of how many pills were in the bottle, or how long they were supposed to last.  All I know is that at one point during the three weeks Denise was in foster care she needed more medicine.
>
> The same day this matter first came to my attention, on November 12, 2002, I made a call to Dr. Zeller's office to get a refill for Denise's prescription.  I had no trouble getting one.  However, the next day Denise's guardian ad litem Bobbie Sherrill, who was assisting me in getting the medication to Denise's foster mother, called to tell me the Martin's pharmacy would not refill the prescription until November 16. . . .

(Docket Entry No. 35, Ex. 2, ¶¶ 5–6).  Haywood further testified that a meeting was convened with Denise's parents, the guardian *ad litem*, and several others on November 14, 2002, to address this problem.  Haywood and CPS addressed the problem and secured a two-day

---

[6]     Haywood had primary involvement in this aspect of the lawsuit.  Several of the defendants claim that they had no role whatsoever in this incident.  (*See, e.g.*, Docket Entry No. 35, Ex. 6, ¶ 3 (Affidavit of Betty Hughes disavowing any role in the selection or monitoring of foster parents); Ex. 9 (Affidavit of Thomas Chapmond disavowing any specific knowledge about any of the particular facts in this case)).  Summary judgment is appropriate for these defendants for this independent reason.  The focus of this inquiry is properly limited to Haywood.

supply of medication for Denise to use until the prescription could be refilled on November 16, 2002.  (*Id.* at ¶ 6).

Neither the complaint nor the summary judgment record contain allegations or evidence that would support an inference that Haywood or any of the other CPS defendants consciously disregarded a risk to Denise's health by failing to provide Denise's foster caregivers with sufficient medication.  Instead, the record reflects that CPS turned over the medicine available to the caregivers.  When the foster caregivers reported that Denise did not have enough medication, the CPS defendants promptly worked to get it.  The record shows that once the CPS defendants knew the potential harm to Denise, they promptly acted.  *Cf. Farmer*, 511 U.S. at 842–43; *compare Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976) (noting, in lawsuit filed by a prisoner who had been denied medical care repeatedly, that neither negligence, medical malpractice, nor "inadvertent failure to provide adequate medical care" rise to the level of deliberate indifference to serious medical needs required to state a claim).

The defendants' motion to for summary judgment on this claim is granted.

### 7.    The Failure to Train and Supervise Claim

The failure to train claims against the CPS defendants are largely failure to supervise claims.  An individual officer cannot be held liable under section 1983 on the basis of *respondeat superior*.  *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997).  "Rather, the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor."  *Id.* (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc)).  "[M]ere proof that the injury could have been prevented if the

officer had received better or additional training cannot, without more, support liability." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).  "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective."  *Id.* (citing *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992)).

The summary judgment record, viewed in the light favorable to the Martins, does not support an inference that a failure to train or supervise contributed to cause the alleged violation of the Martins' constitutional rights.  *See Rivera*, 349 F.3d at 247 (citing *Piotrowski*, 237 F.3d at 578).  The Martins have not specifically alleged nor provided summary judgment evidence as to how the CPS training program was defective.  The CPS defendants' motion for summary judgment on this claim is granted.

**8.     The Claim of a Violation of Federal Duty to Prevent or Eliminate the  Removal of a Child from the Home**

The Martins allege that the CPS defendants violated "their federal statutory duty to prevent or eliminate the need for removal of [Denise] from her home."  (Docket Entry No. 1, ¶ 143).  The Martins did not cite the federal statute.  The claim appears to reiterate the Martins' procedural due-process claim, which has already been addressed.  Defendants' motion for summary judgment on this claim is granted.

**9.     The Malicious Prosecution Claim**

"In this circuit, plaintiffs no longer allege a constitutional violation by satisfying the state law elements of malicious prosecution alone." *Izen v. Catalina*, 398 F.3d 363, 366 (5th Cir. 2005) (citing *Castellano v. Fragozo*, 352 F.3d 939, 942 (5th Cir.2003) (en banc)).  The Fifth Circuit has abolished claims of malicious prosecution raised through section 1983 suits, particularly in cases in which a section 1983 claim seeks redress for alleged Fourth and Fourteenth Amendment violations.  *Castellano*, 352 F.3d at 939.  The Martins have alleged violations of their Fourth and Fourteenth Amendment rights.  No further relief exists for a claim of malicious prosecution.  The summary-judgment motion on the malicious prosecution claim is granted.

### 10.    The Abuse of Civil Process Claim

The Martins allege abuse of civil process under section 1983.  (Docket Entry No. 1, ¶ 125).  This portion of the complaint does not invoke state law, instead reiterating the allegations asserted in the Fourth Amendment-based challenges.  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere." *Colson v. Grohman*, 174 F.3d 498, 504 n.2 (5th Cir. 1999) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).  There is no free-standing federal abuse of civil process claim under section 1983.  Abuse of civil process claims are generally brought as state-law claims over which a federal court entertaining a section 1983 suit has supplemental jurisdiction.  *See, e.g.*, *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005); *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 386 (3d Cir. 2002).  To the extent that the Martins have alleged a

federal right relating to this cause of action, it is included in, and part of, the Fourth Amendment claims.  The defendants' motion for summary judgment on this claim is granted.

### 11.    The Intentional Infliction of Emotional Distress Claim

The Martins allege a state-law claim of intentional infliction of emotional distress by Haywood, Odin, and Hughes.  (Docket Entry No. 1, ¶ 95).  In *Wilson v. Monarch Paper Co.*, 939 F.2d 1138 (5th Cir. 1991), the Fifth Circuit set out in detail the elements of a claim for intentional infliction of emotional distress under Texas law.  First, a plaintiff must show that the defendant acted intentionally or recklessly.  Second, she must show that the defendant's conduct was "extreme and outrageous," "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious."  *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir. 1989) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d).  "[T]he level of atrociousness to which [the behavior] must [rise] is quite high.  Simply put, it must exceed all possible bounds of decency and be utterly intolerable in a civilized society."  *Franklin v. Ensearch, Inc.*, 961 S.W.2d 704, 710 (Tex. App. – Amarillo 1998, n.w.h.).  Third and fourth, the plaintiff must show that the actions of the defendant caused the plaintiff to suffer emotional distress and that the distress was severe.  *See Wilson*, 939 F.2d at 1142; *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993).  There is no litmus test for outrageousness; whether conduct was outrageous and extreme must be analyzed on a case-by-case basis.

The Martins have not met the high threshold needed to create a triable issue of fact material to whether the conduct of Haywood, Odin, or Hughes exceeded "all possible bounds

of decency" or was "utterly intolerable in a civilized society."  *Franklin*, 961 S.W.2d at 710. All three defendants had obtained reports of sexual abuse from Denise's teacher, including observations of physical behavior and marks.  Before the defendants acted, they sought and obtained corroboration from a medical examiner.  The record, viewed in the light favorable to the Martins, does not create a jury issue on the element of outrageousness.  Defendants' motion for summary judgment is granted.

### 12.    The Conspiracy Claim

The Martins allege a claim of state-law civil conspiracy against Sheehan, Hughes, Haywood, and Odin for their conduct in removing Denise from her home, for their actions in pursuing court action following the removal, and for conspiring to keep Denise from her parents.  (Docket Entry No. 1, ¶ 132).

Texas law defines a civil conspiracy as: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result."  *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005) (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)) (additional citations omitted).  "It is not the agreement itself, but an injury to the plaintiff resulting from an act done pursuant to the common purpose that gives rise to the cause of action." *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1980) (citing *Great Nat'l Life Ins. Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex. 1964)).  Conspiracy to commit a tort requires that the parties conspire to commit an intentional tort.  *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 617 (Tex. 1996).

"Under Texas law, government officials are entitled to immunity from suit arising under performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *Hernandez v. Texas Dep't of Protective and Regulatory Servs.*, 380 F.3d 872, 885 (5th Cir. 2004) (citing *Austin v. Johnson*, 328 F.3d 204, 211 (5th Cir. 2003); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994)). The good faith element of the test is substantially the same as the federal inquiry.

The Martins alleged that the CPS defendants engaged in a civil conspiracy to remove Denise from their home on an extrajudicial basis and to provide perjured testimony to keep Denise away from her parents to cover up CPS's "improper" conduct. The summary judgment record does not support these allegations. The Martins have introduced nothing beyond their bare assertions that the CPS defendants perjured their testimony.[7] The record indicates that the CPS defendants received reports that Denise had been a victim of sexual abuse, investigated the allegations, provided the Martins with notice of the investigation, met with the Martins on multiple occasions, and corroborated their suspicions with an independent medical examination. After removing Denise, the CPS defendants convened court proceedings within twenty-four hours, as the law required. This action protected the Martins, not the CPS defendants, and is not actionable as a civil conspiracy. The Martins have failed to state a valid civil conspiracy claim against the CPS defendants. The defendants' summary judgment motion is granted.

---

[7] This court presumes that these allegations, which appear to be a conspiracy to violate the Martins' federal constitutional rights, also amount to state-recognized *tort* actions, which must form the predicate of a state-law conspiracy claim.

### 13.    The Claim of Violations of the Texas Constitution

The Martins allege that the CPS defendants violated sections 9 and 19 of the Texas Constitution.  (Docket Entry No. 1, ¶ 136).  Section 9 claims are coterminous with the Fourth Amendment claims.  *See, e.g.*, *Flores v. State*, 172 S.W.3d 742, 744 (Tex. App. – Houston [14 Dist.] 2005).  These claims are addressed above.  Because Texas's immunity law parallels federal immunity law, *Hernandez*, 380 F.3d at 885, this court's holding that the defendants are entitled to qualified immunity extends to the state law claims.  Section 19 claims are coterminous with the Fourteenth Amendment due process (both procedural and substantive) claims.  *See, e.g.*, *James v. City of Houston*, 138 S.W.3d 433, 438-39 (Tex. App. – Houston [14 Dist.] 2004).  These claims are also addressed above.  The defendants' motion for summary judgment on the state constitutional claims is granted.

## IV.    Conclusion and Order

This court grants Saberi's motion to supplement the record and grants Saberi's motion for summary judgment.  This court grants the CPS defendants' motions for summary judgment.  Final judgment in favor of all defendants is entered by separate order.

SIGNED on December 16, 2005, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge